1

2

3                    **UNITED STATES DISTRICT COURT**

4                         **DISTRICT OF OREGON**

5                         **PORTLAND DIVISION**

6

7  JOE HAND PROMOTIONS, INC.,          )
   a Pennsylvania corporation,         )
8                                       )
                   Plaintiff,           )      **No. 03:11-cv-00065-HU**
9                                       )
   vs.                                  )
10                                      )
   RANDY JACOBSON, individually, and )
11 as the alter ego of PAR III, INC.,)  **MEMORANDUM OPINION AND ORDER**
   *dba* THE PORTERHOUSE RESTAURANT; and) **ON MOTION FOR SUMMARY JUDGMENT**
12 PAR III, INC., an Oregon domestic )
   corporation, *dba* THE PORTERHOUSE  )
13 RESTAURANT;                          )
                                        )
14                 Defendants.          )
                        ───────────────────────────────
15

16

17 Samuel C. Justice
   Attorney at Law
18 610 S.W. Alder Street, Suite 1000
   Portland, OR 97205-3611
19
                   Attorney for Plaintiff
20

21

22 Terrence J. Slominski
   David W. Venables
23 Slominski & Associates
   7100 S.W. Hampton, Suite 101
24 Tigard, OR 97223

25                 Attorneys for Defendants

26

27

28

   1 - MEMORANDUM OPINION AND ORDER

1  HUBEL, Magistrate Judge:

2      The plaintiff Joe Hand Promotions, Inc. ("Joe Hand") brings

3  this action under the Federal Communications Act of 1934, 47 U.S.C.

4  §§ 553[1] and 605[2] (the "FCA"), alleging the defendants Randy Jacobson

5  ("Jacobson") and Par III, Inc. ("Par III"), doing business as the

6  Porterhouse Restaurant (the "Restaurant"), unlawfully exhibited the

7  "Ultimate Fighting Championship 93: Franklin v. Henderson Program"

8  (the "Program") at the Restaurant on January 17, 2009.  Joe Hand

9  claims it paid for and received exclusive nationwide television

10 distribution rights for the Program, and it entered into

11 sublicensing agreements to show the Program with various commercial

12 enterprises throughout North America.  Joe Hand claims the

13 defendants unlawfully intercepted, published, exhibited, and

14 divulged the Program for private financial gain without obtaining

15 a sublicense to do so from Joe Hand, in violation of the FCA. Joe

16 Hand also asserts a common-law claim for conversion of the Program.

17 Joe Hand seeks statutory damages up to $100,000 for the defendants'

18 violation of 47 U.S.C. § 605; statutory damages up to $50,000 for

19 the defendants' violation of 47 U.S.C. § 553; compensatory damages

20 _____

21     [1]Section 553 prohibits the unauthorized reception or receipt
   of "any communications service offered over a cable system, or
22 assisting in the unauthorized reception or receipt of such service."
   47 U.S.C. § 553(a).  Section 553 provides for a private right of
23 action for injunctive relief, damages, and attorneys' fees to "any
   aggrieved party who prevails."  47 U.S.C. § 553(c).

24

25     [2]Section 605 prohibits the unauthorized receipt, assistance in
   receiving, transmitting, or assisting in transmitting, of communi-
26 cations by wire or radio.  Prohibited practices include divulging
   or publishing the intercepted communications for the benefit of the
27 recipient or of "another not entitled thereto."   47 U.S.C.
   § 605(a).  Section 605 provides for a private right of action for
28 injunctive relief, damages, attorney's fees, and costs. 47 U.S.C.
   § 605(e).

2 - MEMORANDUM OPINION AND ORDER

1  to be proved at trial for conversion; and its attorney's fees and

2  costs.  Dkt. #1.

3      The matter is before the court on the defendants' motion for

4  summary judgment.  The defendants move for summary judgment on

5  three grounds, each of which is discussed below.

6

7                           ***Standards***

8      Summary judgment "should be rendered if the pleadings, the

9  discovery and disclosure materials on file, and any affidavits show

10 that there is no genuine issue as to any material fact and that the

11 movant is entitled to judgment as a matter of law."  Fed. R. Civ.

12 P. 56(c)(2).  In considering a motion for summary judgment, the

13 court "must not weigh the evidence or determine the truth of the

14 matter but only determine whether there is a genuine issue for

15 trial."  *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th

16 Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d

17 407, 410 (9th Cir. 1996)).

18     The Ninth Circuit Court of Appeals has described "the shifting

19 burden of proof governing motions for summary judgment" as follows:

20         The moving party initially bears the burden of
           proving the absence of a genuine issue of
21         material fact.  *Celotex Corp. v. Catrett*, 477
           U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
22         265 (1986).  Where the non-moving party bears
           the burden of proof at trial, the moving party
23         need only prove that there is an absence of
           evidence to support the non-moving party's
24         case.  *Id.* at 325, 106 S. Ct. 2548.  Where the
           moving party meets that burden, the burden
25         then shifts to the non-moving party to
           designate specific facts demonstrating the
26         existence of genuine issues for trial.  *Id.* at
           324, 106 S. Ct. 2548.  This burden is not a
27         light one.  The non-moving party must show
           more than the mere existence of a scintilla of
28         evidence.  *Anderson v. Liberty Lobby, Inc.*,

3 - MEMORANDUM OPINION AND ORDER

1            477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.
2            2d 202 (1986).  The non-moving party must do
             more than show there is some "metaphysical
3            doubt" as to the material facts at issue.
             *Matsushita Elec. Indus. Co., Ltd. v. Zenith*
4            *Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.
             1348, 89 L. Ed. 2d 528 (1986).  In fact, the
5            non-moving party must come forth with evidence
             from which a jury could reasonably render a
6            verdict in the non-moving party's favor.
             *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In
7            determining whether a jury could reasonably
             render a verdict in the non-moving party's
8            favor, all justifiable inferences are to be
             drawn in its favor.  *Id.* at 255, 106 S. Ct.
9            2505.

10  *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th

11  Cir. 2010).

12                                      ***Discussion***

13                          ***A.   Corporate Veil***

14      The defendants argue Joe Hand has not shown Jacobson had any

15  involvement in the alleged showing of the Program, and in any

16  event, he cannot be held individually liable for Par III's actions

17  solely on the basis that he is president of the corporation.  Joe

18  Hand responds that Jacobson is listed on records of the Oregon

19  Secretary of State as the registered agent, president, and

20  secretary of Par III, Inc., with no other individual being listed

21  as an officer or shareholder of the corporation.  Joe Hand asserts

22  Jacobson is solely responsible for the day-to-day operations of the

23  corporation (and, therefore, the Restaurant), giving rise to "an

24  inference that the corporation is his alter ego[.]" Dkt. #26 (Pl's

25  Memorandum), p. 3 (citing Jacobson's Declaration, Dkt. #24); *see*

26  Dkt. #24, Jacobson's Declaration, ¶ 2 & attachment).  Joe Hand

27  claims, therefore, that issues of fact exist regarding Jacobson's

28

4 - MEMORANDUM OPINION AND ORDER

1  involvement in showing the Program, precluding summary judgment.
2  *Id.*

3      The defendants rely on *State ex rel. Neidig v. Superior*
4  *National Insurance Co.*, 343 Or. 434, 173 P.3d 123 (2007), in which
5  the Oregon Supreme Court discussed in detail the elements required
6  to pierce the corporate veil.  The analysis begins with the Oregon
7  Supreme Court's decision in *Amfac Foods v. International Systems*,
8  294 Or. 94, 108-09, 654 P.2d 1092, 1101-02 (1982), where the court
9  explained an "exception to the rule of shareholder immunity":

> "We state the exception to the rule as
> follows: When a plaintiff seeks to collect a
> corporate debt from a shareholder by virtue of
> the shareholder's control over the debtor cor-
> poration rather than on some other theory, the
> plaintiff must allege and prove not only that
> the debtor corporation was under the actual
> control of the shareholder but also that the
> plaintiff's inability to collect from the cor-
> poration resulted from some form of improper
> conduct on the part of the shareholder.  This
> causation requirement has two implications.
> The shareholder's alleged control over the
> corporation must not be only potential but
> must actually have been exercised in a manner
> **either causing the plaintiff to enter the**
> **transaction with the corporation or causing**
> **the corporation's default on the transaction**
> **or a resulting obligation.**  Likewise, the
> shareholder's conduct must have been improper
> either in relation to the plaintiff's entering
> the transaction or in preventing or inter-
> fering with the corporation's performance or
> ability to perform its obligations toward the
> plaintiff."

23  *Neidig*, 343 Or. at 454, 173 P.3d at 135 (emphasis added; quoting
24  *Amfac, supra*).

25      The *Neidig* court noted the *Amfac* test, "although easily
26  stated, may not be easily applied. . . .  Indeed, each part of the
27  test - control, wrongful conduct, and causation - can present close
28  legal and factual questions that must be considered in reaching the

5 - MEMORANDUM OPINION AND ORDER

ultimate equitable determination as to whether the corporate veil can be pierced." *Id.*, 343 Or. at 455, 173 P.3d at 136 (citations omitted).  The court quoted with approval from *Fletcher Cyclopedia of the Law of Corporations* § 41.10, 143-47 (2006 rev.), noting *Fletcher* "derives from the cases a three-part inquiry that is consistent with *Amfac*, to-wit:

> "While the factors that will justify piercing the corporate veil vary from jurisdiction to jurisdiction, a number of courts will disregard the existence of a corporate entity when the plaintiff shows: (1) control, not merely majority or complete stock control, but complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control was used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or to commit a dishonest and unjust act in contravention of the plaintiff's legal rights; and (3) that the aforesaid control and breach of duty proximately caused the injury or unjust loss."

*Neidig*, 343 Or. at 455 n.16, 173 P.3d at 136 n.16 (quoting *Fletcher, supra*).

Stated another way:

> To pierce the corporate veil, . . . plaintiff must make a *prima facie* showing that the individual defendants controlled the corporations, that they engaged in improper conduct in their exercise of control, and that their improper conduct caused plaintiff's inability to obtain an adequate remedy from the corporation.

*Aero Planning Int'l, Inc. v. Air Assoc., Inc.*, 94 Or. App. 143, 145, 764 P.2d 610, 612 (1988) (citing *Rice v. Oriental Fireworks co.*, 75 Or. App. 627, 633, 707 P.2d 1250, 1255 (1985)).  In *Aero Planning*, the plaintiff alleged the individual defendants

6 - MEMORANDUM OPINION AND ORDER

1  improperly commingled the accounts and affairs of the corporate
2  defendants, "undercapitalizing them and 'milking' their assets,"
3  apparently to the point that the corporations could not respond to
4  a judgment. *Aero Planning*, 94 Or. App. at 146, 707 P.2d at 612.
5  The court found, however, the plaintiff had failed to establish
6  that, "as between the shareholders and the defendant corporations,
7  the shareholders disregarded the corporate entities." *Id.*

8      In the present case, Jacobson has submitted a Declaration in
9  which he states he "had no involvement in any alleged showing of a
10 UFC event on January 17, 2009, at the Porterhouse Restaurant."
11 Dkt. #24, ¶ 4.  Joe Hand has offered no contrary evidence.
12 Likewise, it has offered no evidence that raises an issue of fact
13 regarding Jacobson's personal involvement in causing Joe Hand to be
14 unable to collect a judgment against the corporation.  Joe Hand has
15 failed to meet its burden to "designate specific facts demon-
16 strating the existence of genuine issues for trial." *In re Oracle*
17 *Corp.*, 627 F.3d at 387. Therefore, the defendants' motion for
18 summary judgment as to Jacobson, in his individual capacity, is
19 **granted**.

20
21                    *B.   Timeliness*

22      The defendants argue Joe Hand's FCA claims are untimely under
23 both Federal Rule of Civil Procedure 4(m), and the FCA, as
24 interpreted by this court in *Kingvision Pay-Per-View Ltd. v. Shilo*
25 *Inn*, 05-cv-1065-HU, Dkt. #18, Findings & Recommendation (D. Or.
26 Mar. 1, 2006) (Hubel M.J.), *adopted* at Dkt. #25 (D. Or. Apr. 26,
27 2006) (Redden, J.).

28

7 - MEMORANDUM OPINION AND ORDER

1    Joe Hand responds that the Complaint was timely filed.  It
2  asserts the filing deadline fell on a legal holiday - Martin Luther
3  King Day, January 17, 2011 - and the Complaint was filed the next
4  day, as allowed by "Federal Rule of Civil Procedure 6(c)" [sic][3].

5    In *Kingvision*, I noted the FCA does not, itself, contain a
6  limitations period for private actions by non-carriers for
7  violations of the "anti-piracy provisions."  I analyzed relevant
8  case law, and concluded the federal Electronic Communications
9  Privacy Act (ECPA) is most analogous to the FCA, and the ECPA's
10  two-year statute of limitations is appropriate for private actions
11  brought under the FCA's anti-piracy provisions.  My analysis was
12  adopted by Judge James A. Redden of this court, who applied the
13  two-year statute of limitations in a similar case.  *See Kingvision,*
14  *supra*.

15    Nothing has occurred to change that analysis here.  The two-
16  year statute of limitations in the analogous ECPA is appropriately
17  applied to Joe Hand's Complaint.  The defendants' unauthorized
18  interception and transmission of the Program allegedly occurred on
19  January 17, 2009[4], which would make the filing deadline January 17,
20

21    [3]The actual applicable subsection is (a)(1)(C), rather than
22  "6(c)."  *Compare* Fed. R. Civ. P. 6(a)(1)(C) *with* Fed. R. Civ. P.
   6(c).

23    [4]The Affidavit of investigator Steve Wilson submitted by Joe
24  Hand contains a discrepancy regarding the date the Program
   allegedly was shown.  On page one, Wilson states he saw the Program
25  being shown on January 17, 2007; on page two, he states the date
   was January 17, 2009.  At oral argument, Joe Hand's counsel
26  indicated Wilson's deposition has been taken, and Wilson explained
   this was a scrivener's error; the correct date was 2009.  Neither
27  party has submitted a copy of the deposition to the court, but the
   defendants do not argue that the 2007 date was anything other than
28  a scrivener's error.  For purposes of the defendants' motion for

8 - MEMORANDUM OPINION AND ORDER

1    2011.  *See* Dkt. #26-1; Fed. R. Civ. P. 6.  Under Federal Rule of
2    Civil Procedure 6, if the last day of the period falls on "a
3    Saturday, Sunday, or legal holiday, the period continues to run
4    until the end of the next day that is not a Saturday, Sunday, or
5    legal holiday."  Fed. R. Civ. P. 6(a)(1)(C).  January 17, 2011, was
6    a legal holiday; as a result, the filing period continued to run
7    until the end of the day on Tuesday, January 18, 2011 - the date
8    this case was filed.  Therefore, the case was filed within the
9    applicable statute of limitations, and the defendants' motion for
10   summary judgment based on a violation of the statute of limitations
11   is **denied.**

12        The defendants also assert a second timeliness argument, based
13   on Joe Hand's failure to serve them within 120 days after the
14   Complaint was filed.  The case was filed on January 18, 2011, and
15   a Scheduling Order was entered by the court.  On June 29, 2011,
16   when no timely service of process had been made within 120 days as
17   required by Federal Rule of Civil Procedure 4(m), the court entered
18   an order requiring Joe Hand to show cause by July 28, 2011, why the
19   case should not be dismissed for failure to prosecute.  Dkt. #4.
20   In response, Joe Hand's counsel submitted a letter outlining his
21   efforts to locate and serve the defendants, and to attempt to
22   obtain a waiver of service.  Dkt. #5.  The court accepted counsel's
23   explanation of his failure to effect service of process, and set a
24   new service deadline of September 16, 2011.  Dkt. #6.

25        When, once again, service had not been made by the deadline,
26   the court entered another Order to Show Cause, directing Joe Hand

27   _____

28   summary judgment, I accept the explanation that the date discre-
     pancy was the result of a scrivener's error.

9 - MEMORANDUM OPINION AND ORDER

1  to show cause by October 26, 2011, why the case should not be

2  dismissed for failure to prosecute. Dkt. #7.  In response, Joe

3  Hand's counsel had Summonses issued to the defendants on

4  October 12, 2011, Dkt. #8; the defendants were served on

5  October 13, 2011, Dkt. ##9-1 & 9-2; and Joe Hand filed a written

6  response to the court's Show Cause Order on October 26, 2011,

7  discussing efforts to determine, in advance of service, whether the

8  defendants were represented by counsel, and to obtain waivers of

9  service. Dkt. #9.  The court reviewed Joe Hand's response to the

10  Show Cause Order, found that good cause had been shown, and ordered

11  the case to proceed. Dkt. #10.

12       The defendants argue the court erred in failing to dismiss the

13  case when Joe Hand failed to effect service of process earlier.

14  They argue there was no showing of good cause for Joe Hand's

15  failure to effect service prior to the original deadline, and the

16  court should reverse its order finding good cause had been shown.

17  The defendants claim Joe Hand's failure even to get Summonses

18  issued until October 12, 2011, showed a lack of diligence in

19  prosecuting the action.  They further argue, without citation to

20  any supporting authority, that the court lacked authority to extend

21  the date for service a second time without good cause, and they

22  claim Joe Hand lacked good cause for its failure to effect service

23  of process sooner. Dkt. #25, pp. 24-26.

24       The defendants rely on Federal Rule of Civil Procedure 4(m),

25  which provides, in pertinent part:

26              If a defendant is not served within 120 days
                after the complaint is filed, the court - on
27              motion or on its own after notice to the
                plaintiff - must dismiss the action without
28              prejudice against that defendant or order that

10 - MEMORANDUM OPINION AND ORDER

> 1  service be made within a specified time.  But
> 2  if the plaintiff shows good cause for the
>    failure, the court must extend the time for
> 3  service for an appropriate period. . . .

Fed. R. Civ. P. 4(m).  On both occasions, the court found Joe Hand
had shown good cause for its failure to effect service on the
defendants sooner.  Joe Hand was attempting to avoid the costs of
personal service by requesting a waiver, pursuant to Federal Rule
of Civil Procedure 4(d).  When those efforts ultimately proved
unsuccessful, Joe Hand had Summonses issued and served the
defendants personally.

The court finds no reasons to disturb its prior rulings that
Joe Hand had shown good cause for failure to effect service sooner.
Further, the court rejects the defendants' argument that the time
to effect service may only be extended once under Rule 4(m).  The
defendants' motion for summary judgment is **denied** on this basis.

### C.  Conversion

The defendants argue Joe Hand cannot show conversion occurred
under Oregon law, and even if the Program was shown, which they
deny, its showing would constitute "'no more than a trespass which
may be compensated by the actual damage inflicted upon the owner,
which would be covered by the reasonable value of the use to which
it was put.'"  Dkt. #25, p. 5 (quoting *Jeffries v. Pankow*, 112 Or.
439, 448, 229 P. 903, 905 (1924)).

Joe Hand responds, first, that whether its "action is properly
styled conversion or trespass . . . matters less under notice
pleading than it would under Oregon law."  Dkt. #26, p. 3.  Joe
Hand asserts the defendants are on notice of the nature of the

11 - MEMORANDUM OPINION AND ORDER

claim, and can respond to it.  *Id.*  Second, Joe Hand argues the defendants' actions do, in fact, meet the elements of conversion under Oregon law.  And third, Joe Hand asserts the defendants are relying on an inappropriate definition of "chattel," taken from the Oregon definition applicable to lien statutes.  Joe Hand claims the definition upon which the defendants rely "is not a statutory definition of chattel for purposes of conversion."  *Id.*  However, Joe Hand offers no alternative definition for "chattel" that it claims the court should apply in this case.

Oregon defines the tort of conversion as the "'intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'"  *Becker v. Pacific Forest Industries, Inc.*, 229 Or. App. 112, 116, 211 P.3d 284, 287 (2009) (quoting *Restatement (Second) of Torts* § 222A (1965); citing *Mustola v. Toddy*, 253 Or. 658, 664, 456 P.2d 1004, 1007 (1969)).  The *Becker* court listed the following nonexclusive factors to be considered in determining whether a conversion has occurred:

> "(2)  In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:
>> "(a)  the extent and duration of the actor's exercise of dominion or control;
>> "(b)  the actor's intent to assert a right in fact inconsistent with the other's right of control;
>> "(c)  the actor's good faith;
>> "(d)  the extent and duration of the resulting interference with the other's right of control;
>> "(e)  the harm done to the chattel;
>> "(f)  the inconvenience and expense caused to the other."

12 - MEMORANDUM OPINION AND ORDER

*Id.* (citing *Mustola v. Toddy*, 253 Or. 658, 666, 456 P.2d 1004, 1008 (1969)); *accord Scott v. Jackson County*, 244 Or. App. 484, 499-500, 260 P.3d 744, 752 (2011); *Briggs v. Lamvik*, 242 Or. App. 132, 255 P.3d 518 (2011).   The *Becker* court noted that no one of these factors is considered dispositive.   *Id.* (citing *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or. App. 696, 707, 64 P.3d 1193 (2003)).

   An actor can even commit conversion unknowingly, "if the actor mistakenly believes that he or she is acting legally with respect to the other person's property, . . . and even if the actor innocently acquires the property from a knowing converter."   *In re Conduct of Martin*, 328 Or. 177, 184-85, 970 P.2d 638, 642 (1998) (citing *Hemstreet v. Spears*, 282 Or. 439, 579 P.2d 229 (1978); *Fredeen v. Stride*, 269 Or. 369, 525 P.2d 166 (1974)).

   Here, the parties disagree as to whether the Program constituted a "chattel" that was capable of being converted.   The defendants rely on the definition of "chattel" that applies in the case of statutory liens; i.e., "movable objects that are capable of being owned, but does not include personal rights not reduced to possession but recoverable by an action at law or suit in equity, money, evidence of debt and negotiable instruments."   ORS § 87.142. Joe Hand argues this definition does not apply for purposes outside the statutory lien context.

   "A chattel is '[m]ovable or transferable property; personal property; esp. a physical object capable of manual delivery and not the subject matter of real property.'"   *Rapacki v. Chase Home Finance LLC*, 797 F. Supp. 2d 1085, 1092 (D. Or. 2011) (Hernandez,

13 - MEMORANDUM OPINION AND ORDER

1  J.) (quoting *Black's Law Dictionary* 268 (9th ed. 2009)).   Several
2  federal   jurisdictions   have   considered   the   question   of   what
3  constitutes   a   "chattel"   for   conversion   purposes   in   various
4  contexts.   Historically, it was only tangible property that could
5  be converted.   In 1959, in the context of the criminal prosecution
6  of a defendant for "conversion" to his own use of the labor and
7  services of a member of the armed forces during duty hours, the
8  Ninth Circuit discussed the "ordinary sense of the word 'convert,'"
9  and what type of property may be converted.   The court observed
10 that the "words 'converts' and 'conversion' really have their
11 origin in the law of torts . . . [and] imply a dealing with goods
12 or personal chattels . . . limited to 'any tangible chattel.'"
13 *Chappell v. United States*, 270 F.2d 274, 277 (9th Cir. 1959)
14 (quoting Harper & James, *The Law of Torts*, § 2.13).   The court
15 noted Messrs. Harper and James had explained, "'Any tangible
16 chattel may be the subject of conversion. . . .   Intangible
17 property relations may not be converted except in the case of an
18 action against a corporation for conversion of shares and in those
19 situations in which the owner of a document is, as such, entitled
20 to the advantages of the intangible relation.'"   *Id.*, 270 F.2d at
21 277 n.6.   The *Chappell* court accepted the proposition that
22 "intangible property relations may not be converted, as that term
23 is commonly used."   *Id.*, 270 F.2d at 277.

24     The *Chappell* court cited, with approval, *Olschewski v Hudson*,
25 262 P. 43 (Cal. Ct. App. 1927), where the court considered whether
26 a list of laundry customers was a chattel capable of conversion.
27 *Id.*, 270 F.2d at 278.   The *Olschewski* court likened the customer
28 list to "the good will of a business," and found a conversion

14 - MEMORANDUM OPINION AND ORDER

action "was not intended to reach so intangible, uncertain, and indefinite a property right." *Olschewski*, 262 P. at 45. The court observed, further, that "[t]he very meaning of the word 'conversion,' as it is used in this sense, is to 'change into another form, substance or state; to transform, or change, as in law, the wrongful appropriation to one's own use of the goods of another.' The very definition of the word presupposes the existence of tangible goods or chattels in a form capable of being changed or transformed, turned over, delivered, or appropriated for the use and benefit of the wrongdoer." *Id.* The *Olschewski* court noted conversion, or trover, operates on "'property capable of identification as being the actual property or thing wrongfully taken and converted.'" *Id.* (quoting *Kerwin v. Balhatchett*, 147 Ill. App. 561, 566 (1909)). The court concluded that a conversion action "lies only for the wrongful appropriation of goods, chattels, or personal property which is specific enough to be identified, and not to such indefinite, intangible, and uncertain property rights as the mere good will of a business, or trade secrets, or a newspaper route, or a licensed market stall for transacting trade." *Olschewski*, 262 P. at 46.

As the nature of property interests began to change, so, too, did the law relating to the type of property that is capable of conversion. Over forty years ago, the United States Court of Appeals for the District of Columbia Circuit observed the "tradi-tional rule . . . that conversion will lie only for the taking of tangible property, or rights embodied in a tangible token necessary for the enforcement of those rights," had been "relaxed in favor of the reasonable proposition that any intangible generally protected

15 - MEMORANDUM OPINION AND ORDER

1  as personal property may be the subject matter of a suit for
2  conversion." *Pearson v. Dodd*, 410 F.2d 701, 708 n.34 (D.C. Cir.
3  1969) (citations omitted); *accord United States v. Collins*, 56 F.3d
4  1416, 1419 (D.D.C. 1995) (citing *Pearson*).   Recently, the Ninth
5  Circuit similarly observed that "[v]irtually every jurisdiction"
6  has, to some degree, discarded the traditional limitation that
7  applied conversion actions only to tangible goods.   *Kremen v.
8  Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) (interpreting California
9  law; holding plaintiff could maintain an action for conversion of
10 an internet domain name).

11      The Oregon courts do not appear to have considered whether an
12 intangible right, such as Joe Hand's license to distribute the
13 Program, constitutes a "chattel" capable of being converted, nor
14 have the Oregon courts ever expressly excluded intangible personal
15 property from the definition of a "chattel" for purposes of a
16 conversion action.   In the context of property tax laws, Oregon
17 statutes define what constitutes "intangible personal property,"
18 distinguishing such property from "'[t]angible personal property'
19 [which] includes but is not limited to all chattels and movables.
20 . . ." ORS § 307.020(1).   Intangible personal property includes,
21 *inter alia*, "contract rights."   ORS § 307.020(1)(a)(F).   In
22 general, "intangible personal property is not subject to assessment
23 and taxation." ORS § 307.030(2); *see, e.g., Northwest Natural Gas
24 Co. v. Dept. of Revenue*, 19 Or. Tax 367, 374, 2007 WL 4127669, at
25 *4 (Or. Tax Reg. Div. Nov. 19, 2007) ("[I]t could be said that the
26 statute defining *intangible* personal property [had], in essence,
27 operative effect in that ORS 307.030 had established the funda-
28 mental rule that intangible personal property was generally not
16 - MEMORANDUM OPINION AND ORDER

subject to tax[, and] [t]herefore, a statute defining some property
as intangible had the operative effect of rendering that property
exempt from taxation."  Emphasis in original.); *Gall v. Dept. of
Revenue*, 19 Or. Tax 188, 191 n.3, 2006 WL 3487425, at *1 (Or. Tax
Reg. Div. Nov. 22, 2006) ("Tangible property is defined as 'all
chattels and movables,' as opposed to intangible property, which
includes, to name a few examples, shares of stock, computer
software, goodwill, and trade secrets.  ORS 307.020.").

    In *Reynolds v. Schrock*, 197 Or. App. 564, 107 P.3d 52 (2005),
*rev'd on other grounds*, 341 Or. 338, 142 P.3d 1062 (2006), the
Oregon Court of Appeals had occasion to consider whether an
unrecordable security interest in real property that arose from a
settlement agreement between two adversaries was a chattel subject
to conversion.  The court observed, "Often, the 'chattel' that is
the subject of a conversion action is tangible personal property."
*Reynolds*, 197 Or. App. at 578, 107 P.3d at 60 (citations omitted).
The court's use of the word "often" suggests that sometimes, the
"chattel" subject to conversion will not be "tangible personal
property."  The *Reynolds* court cited a specific exception to the
general rule, noting that in 1938, "the Oregon Supreme Court . . .
recognized that an unrecorded mortgage on land to secure an
existing debt is also a 'chattel' capable of being converted; thus,
a mortgagor states a claim for conversion when the mortgagee sells
the burdened property to a third party, so as to deprive the
mortgagor of its security interest in the property." *Reynolds*, 197
Or. App. at 578, 107 P.3d at 60-61 (citing *Conley v. Henderson*, 158
Or. 309, 325, 75 P.2d 746, 753 (1938)).  However, the *Reynolds*
court held the "unrecordable security interest" at issue in the

17 - MEMORANDUM OPINION AND ORDER

1   case actually never came into being; it was contingent on events
2   that never occurred, rendering it only a "potential security
3   interest" that was not a chattel capable of conversion. *Reynolds*,
4   197 Or. App. at 579, 107 P.3d at 61. *See also Willamette Quarries,*
5   *Inc. v. Wodtli*, 308 Or. 406, 413, 781 P.2d 1196, 1201 (1989) ("This
6   court has also held that '[o]ne must be entitled to immediate
7   possession of a chattel before he [or she] can successfully contend
8   that the actor's failure to yield possession constitutes con-
9   version.'") (quoting *Artman v. Ray*, 263 Or. 529, 531, 501 P.2d 63,
10  64 (1972), in turn citing *Restatement (Second), Torts* § 225
11  (1965)).

12      It thus appears there is no controlling precedent in the
13  decisions of the Oregon appellate courts as to whether the type of
14  property at issue here would fall within the definition of a
15  "chattel" capable of conversion. Nevertheless, I find it likely
16  the Oregon courts would conclude that a license or contractual
17  right to receive a transmitted signal; to rebroadcast the signal;
18  and to determine when, where, and by whom the program contained
19  within the signal can be displayed or exhibited, constitutes a
20  chattel that can be converted. This holding is consistent with
21  courts' treatment of the evolving state of property and property
22  rights. As Justice Stevens once observed, "The human condition is
23  one of constant learning and evolution - both moral and practical.
24  Legislatures implement that new learning; in doing so they must
25  often revise the definition of property and the rights of property
26  owners." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003,
27  1069, 112 S. Ct. 2886, 2921, 120 L. Ed. 2d 798 (1992) (Stevens, J.,
28  dissenting).

18 - MEMORANDUM OPINION AND ORDER

1    I find it likely the Oregon courts would concur with decisions
2  from other jurisdictions holding rights such as those claimed by
3  Joe Hand in this case are subject to conversion. *See, e.g.,* *J&J*
4  *Sports Productions, Inc. v. Gamino*, slip op., 2012 WL 913743, at *4
5  (E.D. Cal. Mar. 16, 2012) ("exclusive right to distribute a
6  broadcast signal to commercial establishments constitutes a 'right
7  to possession of property' for purposes of conversion.") (citing
8  *Don King Prods./Kingvision v. Lovato*, 911 F. Supp. 419, 423 (N.D.
9  Cal. 1995); *DIRECTV, Inc. v. Pahnke*, 405 F. Supp. 2d 1182, 1189
10 (E.D. Cal. 2005)); *DirecTV, Inc. v. Cantu*, 2004 WL 2623932, at *2
11 (W.D. Tex. Sept. 29, 2004) (noting other courts have "found that
12 broadcast signals are valuable property in and of themselves and
13 that plaintiffs may obtain damages for wrongful interception of
14 these signals without resort to the Copyright Act") (citing cases
15 from the Eastern District of New York; and the Eighth Circuit Court
16 of Appeals, applying South Dakota law); *DIRECTV, Inc. v. McCool*,
17 339 F. Supp. 2d 1025, 1038 (M.D. Tenn. 2004) (holding DirecTV's
18 encrypted satellite signals "are comparable to the confidential
19 telephone authorization codes used by MCI," and are capable of
20 conversion; citing *Lovato, supra*); *In re Marriage of Langham and*
21 *Kolde*, 153 Wash. 2d 553, 564-65, 566, 106 P.3d 212, 218 (2005)
22 (finding stock options are chattels capable of conversion; citing
23 definition of "a chattel personal" in *Black's Law Dictionary* 251
24 (8th ed. 2004), which defines the term as a "tangible good or an
25 intangible right (such as a patent)"; observing that "[t]he older
26 approach to conversion is misguided when applied to intangible
27 property"); *but see DirecTV, Inc. v. Chorba*, 2005 WL 3095067, at *2
28 n.3 (M.D. Pa. Nov. 18, 2005) (citing another unreported decision

19 - MEMORANDUM OPINION AND ORDER

from the same court, holding "satellite broadcast signals are not tangible property subject to conversion under Pennsylvania common law"); *Miller v. Hehlen*, 209 Ariz. 462, 104 P.3d 193 (2005) (holding a customer list was neither tangible property, nor "intangible property merged with a document in the same sense as a stock certificate or an insurance policy," and therefore, the customer list did not constitute a chattel subject to conversion).

The Tennessee Court of Appeals, in *Freedom Broadcasting of TN, Inc. v. Tenn. Dept. of Rev.*, 83 S.W.3d 776 (Tenn. Ct. App. 2002), made some illuminating observations about the character of broad-cast signals. The case arose from the plaintiff taxpayers' appeal from denial of their application for "an industrial machinery exemption from taxes on certain broadcasting equipment," pursuant to Tennessee law. An ALJ found that rather than "producing tangible personal property," the taxpayers provided a service, and therefore, the taxpayers were not entitled to the requested exemption. *Id.*, 83 S.W.3d at 778. The chancery court reversed the ALJ's decision, holding the taxpayers were entitled to the exemption. The Tennessee Department of Revenue appealed.

The appellate court affirmed the chancery court's decision. The court noted the Tennessee Code defines "tangible personal property" as "'personal property, which may be seen, weighed, measured, felt, or touched, or is in any other manner perceptible to the senses.'" *Id.*, 83 S.W.2d at 783 (quoting Tenn. Code § 67-6-102(29)). The court observed that many characteristics of broadcast signals are measurable; for example, the signals' fre-quency and amplitude. The signals also are perceptible to the senses of anyone who has the appropriate receiver. The court held,

20 - MEMORANDUM OPINION AND ORDER

"Because the signals are capable of measurement and perceptible to the senses, the broadcast signals, like electricity, meet the definition of tangible personal property." *Id.*

In the present case, Joe Hand possessed a license or contract right to the broadcast signal containing the Program. I find persuasive the Tennessee court's conclusion that a broadcast signal is, in some sense, tangible property. Joe Hand was contractually entitled to determine when, where, and by whom the broadcast signal containing the Program could be displayed to the viewing public. An unauthorized showing of the Program would result in an exercise of dominion or control over the broadcast signal constituting a "failure to yield possession." I find, therefore, that the broadcast signal was subject to conversion, and Joe Hand can maintain its conversion action. As a result, the defendants' motion for summary judgment on the conversion claim is **denied.**

## CONCLUSION

In conclusion, the defendants' motion for summary judgment as to Jacobson, in his individual capacity, is **granted,** and the motion is **denied** on all other grounds.

IT IS SO ORDERED.

Dated this __7th___ day of June, 2012.

/s/ Dennis J. Hubel
_____
Dennis James Hubel
Unites States Magistrate Judge

21 - MEMORANDUM OPINION AND ORDER